1

2

3

4

5

6                        IN THE UNITED STATES DISTRICT COURT

7

8                        FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10    IN RE CNET NETWORKS, INC.                    No. C 06-03817 WHA
      SHAREHOLDER DERIVATIVE
11    LITIGATION

12    _____      **ORDER GRANTING NOMINAL**
                                                   **DEFENDANT'S MOTION TO**
13                                                 **DISMISS AND REQUESTING**
      This Document Relates To:                    **SUPPLEMENTAL BRIEFING**
14
      ALL ACTIONS
15
      _____/
16

17                              **INTRODUCTION**

18           In this shareholder derivative action, individual defendants and nominal defendant move

19    to dismiss plaintiffs' second amended verified complaint.  The complaint alleges claim under

20    Section 10(b), Section 14(a), and Section 20(a) of the Securities Exchange Act of 1934 and

21    Section 304 of the Sarbanes-Oxley Act of 2002.  As this action was brought as a derivative

22    action, plaintiffs are required to make a demand on the board, or else plead with particularity

23    that demand was futile.  Plaintiffs have failed to plead with particularity that demand on the

24    board was excused as futile under FRCP 23.1.  Accordingly, nominal defendant's motion to

25    dismiss for failure to plead demand futility is GRANTED.  Because of this, this order does not

26    address the merits of the individual defendants' motions to dismiss.  Plaintiffs and nominal

27    defendant are requested to submit supplemental briefing a narrow discovery issue.

28

United States District Court

For the Northern District of California

**United States District Court**
For the Northern District of California

**STATEMENT**

**1.    THE MECHANICS OF STOCK-OPTIONS BACKDATING.**

In March of 2006, the *Wall Street Journal* published a series of newspaper articles analyzing certain stock options granted by companies to their executives.  By analyzing patterns in price movements and stock returns, the articles found that some of the grant dates for the options eventually yielded extraordinarily high returns versus what would have been expected by pure chance.  The grant date for these options fell on a date when the stock price was at a periodic low point, followed by a rapid increase in price.  In some instances, the odds of achieving such buy-low-sell-high returns were slimmer than winning the lottery.  In a few instances, the odds were less than winning the lottery several times over.  Charles Forelle and James Bandler, "The Perfect Payday," *Wall St. J.*, March 18, 2006, at A1.  Subsequent articles revealed such exquisitely timed grants to be widespread.  Since these articles, stock options backdating has been on page one of the financial press.

A company grants stock options to its employees at a certain exercise price.  This gives the employee the right to purchase the stock at the exercise price at a later date after the option vests.  If the stock price rises, the employee stands to make a profit.  If the stock price falls below the exercise price, the option is worthless to the employee.  Options where the exercise price is at the market price as of the date of the grant are referred to as "at-the-money" options.  Options where the exercise price is lower than the market price as of the grant date are referred to as "in-the-money" options.  For financial reporting purposes, companies are required to record compensation costs for granting in-the-money options because the company effectively receives a lower price than it could get for the shares on the open market.  No compensation costs need be recorded for at-the-money options because the exercise price is the same as the market price.  The company is not foregoing any revenue.  Because they are so closely tied with the company's stock price, and in turn the company's fortunes, stock options have been considered by some to be an important part of incentive-based compensation.

Backdating occurs when the option's grant date is altered to an earlier date with a lower, more favorable price to the recipient.  The option price is normally the market price as of the

2

United States District Court

For the Northern District of California

1    grant date.  If the option's price is below the price on the market as of the grant date, the

2    company has to recognize the difference between the two as a compensation expense.  If the

3    option's price is at or above the price on the market at the grant date, the company recognizes

4    no compensation expense.  For options backdated to a lower price, the proper accounting is to

5    recognize an expense.  This, of course, will lower or eliminate the company's earnings for the

6    period of the backdated grants.

7           **2.     CNET.**

8           On May 16, 2006, the Center Financial Research and Accountability published a report

9    titled "Options Backdating — Which Companies Are at Risk?"  The report identified certain

10   companies that were at risk for having granted backdated stock options, including nominal

11   defendant CNET (Herkenhoff Decl. Exh. A).  In an effort to address the ensuing storm at

12   CNET, its board of directors announced on May 22, 2006, that it had appointed a special

13   committee of independent directors to investigate stock options granting practices (CNET Req.

14   Jud. Not. Exh. A).  On July 10, 2006, CNET announced that pursuant to the investigation, it

15   would have to restate its financial statements for the years 2003, 2004, and 2005 (Compl. ¶ 5).

16   Lawsuits, including this action, quickly followed.

17          By October 11, 2006, the internal investigation was completed culminating in the

18   special committee report.  The entire contents of the report were not released to the public.

19   CNET issued a press release summarizing some of the special committee's findings.  It stated

20   that "[t]here were deficiencies with the process by which options were granted at CNET,

21   including in some instances the backdating of option grants, during the period from the

22   Company's IPO in 1996 through at least 2003."  It also stated that "[t]he report does not

23   conclude that any current employees of the Company or any recently resigned employees

24   engaged in intentional wrongdoing" (CNET Req. Jud. Not. Exh. G).  The entire report itself was

25   circulated internally at CNET and was given to various agencies, including the SEC, the United

26   States Attorney's Office for the Northern District of California, and NASD.  At the same time,

27   CNET was facing delisting proceedings by the NASDAQ because of delays in its financial

28   statements.  Only a bullet-point summary of the report was included in the press release.

United States District Court
For the Northern District of California

On December 26, 2006, CNET disclosed in a Form 8K filed with the SEC that some employees, including moving defendants Ashe, Briggs, Colligan, and Robison had entered into agreements amending the exercise price of stock options that may have been granted to them at below-market value to the extent those options had not yet vested (Singerman Decl. Exh. E). Additionally, Currie, Nelson, Mohn, Colligan and Robison allegedly entered into agreements with the company to repay the difference between the exercise price and the stock's price on the true date of the grant for options that had been exercised (*ibid.*).

CNET filed its restated financial statements with the SEC on January 29, 2007. Plaintiffs allege that CNET admitted in these statements to granting backdated stock options, while defendants state that the stock options were merely mispriced for accounting purposes and that no intentional wrongdoing took place. The restated financial statement said "we [CNET's management and the special committee] identified instances where the grant date used by us as the measurement date for accounting purposes, differed from the measurement date as defined in Accounting Principles Board Opinion No. 25 . . . for more than the grants identified in the CFRA report" (*id.* at Exh. F). The amended 10K described CNET's process in correcting grant dates, and the evidence on which it relied in doing so. As a result of the adjustments, CNET recognized an additional stock-compensation expense of $105.7 million over the years from 1996 through 2005. CNET reiterated that the committee had found that no current or recently resigned employees or directors had engaged in any intentional wrongdoing (*ibid.*).

**3. PARTIES.**

Plaintiffs Martin Melzer and James L. Finn were (and remain) shareholders of nominal defendant CNET Networks, Inc., at all times relevant to this action (Compl. ¶ 23–24). Defendants are current and former CNET directors and officers.

As to all individual defendants, plaintiffs allege that each of the directors helped prepare all financial statements and proxy statements for filing with the SEC during their respective tenures at CNET. Plaintiffs plead that each director "ratified" all allegedly backdated stock options granted during his or her time on the board. Each of the proxy statements and financial statements issued from 1998 until 2006 is alleged to contain misrepresentations as a result of

4

United States District Court

For the Northern District of California

backdating and for the purpose of continuing the alleged backdating scheme.  Plaintiffs make no allegations that any defendant exercised backdated options or sold stock acquired from those options.  Plaintiffs also do not allege how they arrived at the value of plaintiffs' stock options or at what time the alleged value was measured.

The following individual defendants were members of CNET's board of directors at the time the complaint was filed on June 19, 2006.

Defendant Shelby Bonnie served on CNET's board of directors since 1993, as its CEO since March 2000, and as its chairman of the board since November 2000 (Compl. ¶ 27).  He resigned from the company in October 2006, allegedly because of his role in the backdating scheme.  Plaintiffs allege that he personally benefitted from receiving backdated stock options worth at least $7.6 million.  Bonnie allegedly sold over three million CNET shares, receiving proceeds of $58.4 million.  Plaintiffs do not allege that the shares Bonnie sold were those he acquired by exercising backdated options.  They only plead that he sold shares based on material non-public information related to backdating at CNET.

Defendant John C. Colligan served as a director since 1996.  Allegedly, he was a member of the compensation committee from 1999 until 2006, and served on the audit committee from 1997 until 2000 (Compl. ¶ 28).  He is alleged to have received backdated stock options worth at least $561,000.

Defendant Eric Robison began serving on the board of directors in December 1994.  He was allegedly a member of the audit committee from 1997 until 2006, and a member of the compensation committee from 2002 through 2003.  He is alleged to have received at least $561,000 worth of backdated stock options (Compl. ¶ 32).

Defendant Jarl Mohn began serving on CNET's board of directors in December 2003.  He served as a member of the compensation committee from 2004 to 2006, and as a member of the audit committee from 2005 to 2006.  He is alleged to have received at least $352,000 worth of backdated stock options (Compl. ¶ 30).

Defendant Elizabeth A. Nelson also joined CNET's board of directors in December 2003.  She served on the audit committee from at least 2003 until 2006, and on the

1  finance committee from at least 2004 until 2006.  Like Mohn, plaintiffs allege that she received

2  backdated stock options worth at least $352,000 (Compl. ¶ 31).

3      Defendant Peter L.S. Currie served as a CNET director since December 2005, and as a

4  member of the audit committee since at least 2005.  Plaintiffs did not allege that Currie received

5  or personally benefitted from backdated stock options (Compl. ¶ 29).

6      The following defendants are current executives of CNET and have never served on the

7  board of directors.

8      Defendant Barry D. Briggs was president of CNET Media from October 2000 until at

9  least 2004.  He has been CNET's president and COO since 2005.  Briggs allegedly received

10  backdated stock options worth at least $7.5 million (Compl. ¶ 39).

11      Defendant Neil M. Ashe became CNET's executive vice president in 2005.  Prior to

12  that, he served as senior vice president of CNET Media from May 2002 until at least late in

13  2004.  Plaintiffs allege that Ashe received at least $934,000 worth of backdated stock options

14  and sold stock worth $470,300 based on material, non-public information (Compl. ¶ 38).

15  Plaintiffs do not allege that Ashe exercised the options.

16      Defendant George E. Mazzotta has been the company's CFO since July 2005.  Plaintiffs

17  allege that he authorized the misreporting of backdated stock options and helped prepare and

18  sign financial statements to that effect.  There are no allegations that Mazzotta received

19  backdated stock options (Compl. ¶ 37).

20      The following defendants were former directors and executives of CNET.

21      Defendant Halsey Minor co-founded CNET in 1992 and served the company as

22  chairman of the board, president and CEO from the company's inception until March 2000

23  (Compl. ¶ 26).  He is also alleged to have received backdated stock options worth at least

24  $9.6 million and sold at least two million shares of CNET stock, receiving proceeds of at least

25  $72 million.  Plaintiffs do not allege that Minor exercised backdated options.

26      Defendant Mitchell E. Kertzman was a member of CNET's board of directors from 1996

27  until at least 2003.  He served on the compensation committee from 1997 to 2000 and in 2003,

28  and on the audit committee from 2001 through 2003.  He is not alleged to have received any

backdated stock options.  Plaintiffs do allege, however, that he sold CNET stock for proceeds of at least $3.4 million based on material, non-public information related to undisclosed backdating (Compl. ¶35).

Defendant Douglas N. Woodrum served on CNET's board of directors from 1997 until October 2000.  He was also an executive vice president and CFO from December 1997 until October 2004.  Plaintiffs allege that Woodrum received backdated stock options worth at least $3.4 million (Compl. ¶ 36).  There are no allegations that defendant exercised these options.

Defendant Richard J. Marino was a president of CNET from April 1999 until March 2001.  Marino allegedly received at least $29.5 million worth of backdated stock options from CNET (Compl. ¶ 40).

Defendant Eric Hippeau served as a CNET director from October 2000 through December 2003.  He was a member of the compensation committee while he served as a director.  Plaintiffs did not allege that Hippeau received backdated options, but they did allege that he sold CNET stock for proceeds of at least $5 million based on material, non-public information (Compl. ¶ 34).

Defendant Art Fatum was CNET's president of international media from October 2000 until at least July 2002.  Thereafter, he served as CNET's COO until August 2003.  Plaintiffs allege that he received backdated stock options worth at least $307,800.

Defendant Daniel Rosensweig was CNET's president and a director from October 2002 to April 2002.  Plaintiffs allege that Rosensweig received stock options worth at least $14 million (Compl. ¶ 33).  Plaintiffs do not allege that Rosensweig sold any stock or exercised any of these options.

**4.      PROCEDURAL HISTORY.**

The first complaint in this action was filed on June 19, 2006, alleging both securities and state-law claims.  An order issued on August 31, 2006, consolidating Melzer's and Finn's actions and appointing them co-lead plaintiffs.  Plaintiffs filed a consolidated complaint on September 28, 2006.  The Court set a schedule for briefing and hearing defendants' motions to dismiss.  Defendants filed motions on October 26, 2006, as well as a motion to stay discovery

7

1   pending their outcome.  Instead of filing an opposition, plaintiffs filed a first amended

2   complaint.  It omitted the state-law claims and only alleged violations of the federal securities

3   laws and the Sarbanes-Oxley Act.  Defendants' motion to stay discovery was granted thereafter.

4   Plaintiffs filed a motion to compel production of the special committee's report which was

5   denied.

6        The extant, second amended verified consolidated complaint was filed on February 22,

7   2007, after CNET had filed its restated financial statements with the SEC.  The final version of

8   the complaint alleges four derivative claims.  It alleges violations of Section 10(b), Section

9   14(a), and Section 20(a) of the Exchange Act of 1934, as well as a claim for disgorgement of

10  incentive-based compensation under Section 304 of the Sarbanes-Oxley Act of 2002.  A total of

11  six motions to dismiss were filed, including motions by groups of individual defendants as well

12  as on behalf of nominal defendant CNET.  A hearing was held on April 5, 2007.

13                                           **ANALYSIS**

14       A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the claims alleged

15  in the complaint.  A complaint should not be dismissed "unless it appears beyond doubt that the

16  plaintiff can prove no set of facts in support of his claim which would entitle him to relief."

17  *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957).  However, "conclusory allegations of law and

18  unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a

19  claim."  *Epstein v. Wash. Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996).

20       In arguing these many motions to dismiss, defendants and nominal defendant ask the

21  Court to take judicial notice of the full text of a number of SEC filings and public documents

22  which are referenced in the complaint.  On considering a motion to dismiss, judicial notice of

23  the full text of documents referenced in a complaint is proper under the doctrine of

24  incorporation by reference.  *No. 84 Employer-Teamster Joint Council Pension Trust Fund v.

25  Am. W. Holding Corp.*, 320 F.3d 920, 925 n.2 (9th Cir. 2003).  For other publicly filed

26  documents, "[a] court may take judicial notice of public filings when adjudicating a motion to

27  dismiss a complaint for failure to state a claim upon which relief can be granted."  *In re Calpine

28  Sec. Litig*, 288 F. Supp. 2d 1054, 1076 (N.D. Cal. 2003).  Accordingly, documents referenced in

United States District Court
For the Northern District of California

1   plaintiffs' complaint and CNET's public filings are the proper subjects of judicial notice and

2   will be considered in the disposition of these motions.

3       **1.    LEGAL STANDARD FOR DEMAND FUTILITY.**

4       Nominal defendant CNET moves to dismiss the derivative complaint for failure to make

5   a demand on the board.  A shareholder bringing a derivative action must "allege with

6   particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires

7   from the directors or comparable authority . . . and the reasons for plaintiff's failure to obtain

8   the action or for not making the effort."  Fed. R. Civ. P. 23.1.  "A shareholder seeking to

9   vindicate the interests of a corporation through a derivative suit must first demand action from

10  the corporation's directors or plead with particularity the reasons why such demand would have

11  been futile."  *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 989 (9th Cir. 1999).  "A trial

12  court need not blindly accept as true all allegations, nor must it draw all inferences from them in

13  plaintiffs' favor unless they are reasonable inferences."  *Grobow v. Perot*, 539 A.2d 180, 187

14  (Del. 1988).  Here, plaintiffs do not allege that they made a demand.  They instead plead that

15  doing so would have been futile.  "[A] court that is entertaining a derivative action . . . must

16  apply the demand futility exception as it is defined by the law of the state of incorporation."

17  *Kamen v. Kemper Fin. Serv., Inc.*, 500 U.S. 90, 108–09 (1991).  CNET was incorporated in

18  Delaware, so Delaware law applies on this point.

19      Two tests for demand futility are applied under Delaware law.  If a derivative suit

20  challenges a decision made by a board of directors, then plaintiffs are excused from making a

21  demand if "under the particularized facts alleged, a reasonable doubt is created that (1) the

22  directors are disinterested and independent and (2) the challenged transaction was otherwise the

23  product of a valid exercise of business judgment."  *Aronson v. Lewis*, 473 A.2d 805, 814

24  (Del. 1984).  A different test applies where the directors did *not* make a decision.  "[A] court

25  must determine whether or not the particularized factual allegations of a derivative stockholder

26  complaint create a reasonable doubt that, as of the time the complaint is filed, the board of

27  directors could have properly exercised its independent and disinterested business judgment in

28  responding to a demand."  *Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993).  To prove that

United States District Court
For the Northern District of California

9

**United States District Court**
For the Northern District of California

1  demand would have been futile, the plaintiff must show that a majority of directors were not

2  independent or disinterested, *i.e.*, if three directors on a six-member board were not independent

3  or disinterested, demand would be excused.  *Beam ex rel. Martha Stewart Living Omnimedia,*

4  *Inc. v. Stewart*, 845 A.2d 1040, 1046 (Del. 2004).

5        In their complaint, plaintiffs refer both to the board member's "actions and conscious

6  failure to act" (Compl. ¶ 205).  Most of plaintiffs' allegations, however, refer to the board's

7  actions, such as ratifying option grants, preparing and signing proxy statements and financial

8  statements, and financially benefitting from backdated options.  Accordingly, the *Aronson* test

9  for demand futility applies.  Plaintiffs argue that demand would have been futile under several

10  theories.  *First*, demand would be futile because each of the six CNET board members as of the

11  time of the complaint, Bonnie, Colligan, Currie, Mohn, Nelson and Robison, all had received

12  backdated options.  *Second*, plaintiffs allege that each of these directors "ratified" the grants of

13  backdated options.  *Third*, plaintiffs allege that demand would have been futile because Mohn,

14  Robison and Colligan were on the compensation committee, and as such they were responsible

15  for granting options under the options plans.  *Finally*, plaintiffs also allege that those three

16  directors would face a substantial likelihood of personal liability for the backdated options.

17  Plaintiffs, however, have failed to plead with particularity facts that would raise a reasonable

18  doubt that any three of the directors on the board as of the time of the complaint were not

19  disinterested or independent, or that their decisions were not the product of business judgment.

20  Accordingly, nominal defendant's motion is **GRANTED**, plaintiffs' complaint is **DISMISSED**.

21        **2.    ACCOUNTING AND ANALYTICAL METHODS.**

22        Plaintiffs allege that demand was futile because all board members received backdated

23  options.  Nominal defendant CNET contends that there was no intentional wrongdoing in its

24  options-granting practices.  Any backdated options were merely the product of accounting

25  errors, not illegal activity, it says.  This order now examines both defendants' arguments based

26  on accounting practices and plaintiffs' methodology for determining whether grants were

27  backdated.

28

1

**A.    APB 25 and Accounting Practices.**

2        At all times relevant to this action, the reporting of expenses associated with stock

3   options was governed by Accounting Principles Board Opinion No. 25, "Accounting for Stock

4   Issued to Employees."  APB 25 recognized two kinds of options.  If the option had an exercise

5   price lower than the fair market value of the stock as of the "measurement date," the company

6   would have to recognize a compensation expense for the option over the period of time the

7   employee performed services for the company.  The expense would be equal to the difference

8   between fair market value as of the grant date and the exercise price.  APB 25 §§ 12–14.  As

9   stated, such grants are referred to as "in-the-money."  If the grants' exercise price was equal to

10  the fair market value of stock on the measurement date, the company would not have to

11  recognize a compensation expense.  Such grants are referred to as "at-the-money."

12       Critical to this rule, and to this action, is the option's "measurement date."  This term

13  refers to the date on which the fair market value of option is determined.  The measurement date

14  is the first date on which are known both (1) the number of options that an individual employee

15  is entitled to receive, and (2) the option or purchase price.  APB 25.10(b).  Frequently, the

16  measurement date is the date the option is granted to the employee.  A slightly more

17  complicated situation arises when the grant is conditioned on some event occurring after the

18  decision is made to grant the options.  For instance, a grant could be made to an employee on

19  joining the company, on taking on new responsibilities, or on taking on a new position within

20  the company.  In these instances, the number of shares and the purchase may be known before

21  the condition is fulfilled.  The measurement date, however, is not set until the condition

22  happens.

23       The Chief Accountant's Office of the SEC has identified a few instances where a

24  company could use the wrong measurement date through sloppy accounting practices not rising

25  to the level of fraud (CNET Req. Jud. Not. Exh. E).  Oral approvals of options are arguably one

26  such instance.  Even though the terms of the option, that is, the number of shares, the recipient

27  and the exercise price, are known on a certain date, all administrative actions may not have yet

28  been taken to make the terms of the option final.  In such situations, however, the facts and

11

circumstances surrounding the option grants can arguably establish that the terms of the grant were final on an earlier date. Some companies' stock options plans do not require that all administrative actions be completed before granting the options. Since APB 25 judges the measurement date from the date that both facts were known, the measurement date in such situations should be the earlier date, not the date on which all administrative actions were completed (CNET Req. Jud. Not. Exh. E at Section B).

A common practice, particularly in the high-technology sector, is to give an employee or director stock options on commencing employment. The amount and exercise price of the options to be given to the employee may be known before they actually begin work. Commencing work, however, is a condition precedent to the option grant. According to the Chief Accountant's Office, the measurement date should be only after the employee begins service with the company. This view makes sense because, until the employee actually starts work or fulfills the condition, the recipient and amount of options are not truly known. For example, the employee may still back out at the last moment, in which event the options would never be granted.

Another issue arises where the board is given discretion to allocate a certain number of options to its employees. Here, the overall number of options to be granted may be known well in advance of the exact recipients and their respective numbers of options. The recipients and numbers may be subject to change, or subject to the board's approval. Under APB 25, however, that information is not known until the grants are finalized and approved by the board. A twist on this scenario is where the board delegates authority to a subset of itself, or to other employees, to decide who receives the grants, in what amount, and on what dates. Again, the amounts, recipients, and prices are not known for certain until the board approves the options. The measurement date cannot occur until the options are approved by those with authority to do so.

The common thread to all of these scenarios is that determining the correct measurement date depends on the facts. This dependence can admit the possibility of innocent error — using an incorrect measurement date to price the options with no intent to find an advantageously low

12

United States District Court

For the Northern District of California

price.  Intentionally employing hindsight to adjust the grant date to an advantageously low price, or "backdating," is fraud.  Backdating is done to avoid recognizing compensation expenses.  Yet grantees get options that start out in-the-money which enriches them by that amount.  This is particularly pernicious where options are granted as incentive-based compensation.  The employee gets the incentive without doing anything to increase the company's value.

**B.**     **Plaintiffs' Methodology in Alleging Backdated Stock Options.**

We are at the pleading stage.  The issue is whether plaintiffs have alleged circumstances from which we may reasonably infer backdating as opposed to innocent bookkeeping error.  As is often the case, direct evidence of intent is rare and difficult to uncover.  Plaintiffs argue that illegal backdating, and not mere accounting errors, can be inferred from the fact that so many of the options' grant dates were at or near historic lows in a certain period.  The odds of this occurring from innocent error, they urge, are so slim as to exclude innocent error as a practical possibility.

Backdating has been widely studied by various methods since news of the practice first came to light.  On March 18, 2006, an article appeared in the *Wall Street Journal* that detailed suspicious options grants to directors and officers in some companies.  Forelle and Bandler, "The Perfect Payday," *Wall St. J.*, Mar. 18, 2006, at A1.  It noted that generally, a pattern of sharp stock-price appreciation after grant dates is a fairly clear signal that the dates were not selected by chance, that fraud may have occurred.  If the grant dates were selected at random, performance after grant dates should be more or less random as well.  To find such a pattern, some analysts looked at the twenty trading days after the grant was made and calculated how much each company's stock appreciated in that period.  The stock appreciation in the twenty trading days following the grant date was ranked against the appreciation in the same period measured from each trading day in the year.  Companies with consistently highly ranked grant dates were considered to be at risk for having granted backdated options.  The *Wall Street Journal*'s study did not look at CNET.

13

**United States District Court**
For the Northern District of California

1    The Center for Financial Research and Analysis conducted its own study on backdating.

2    Its report, issued on May 16, 2006, identified a number of companies that were at risk for

3    having granted backdated stock options, CNET included.  Its method was to first identify firms

4    that used a high amount of stock-based compensation.  Next, it individually analyzed those

5    firms' stock options grants, looking for any options where the price on the grant date was within

6    105% of the ten-day or forty-day periodic low point in stock price and where the price range

7    within that period was more than ten percent of the lowest stock price.  Grants that met the

8    criteria were flagged.  The report compared each firms' number of flagged grants to the total

9    number of grants from 1998 through mid-2002.  Companies with more than three flagged grants

10   were considered to be at risk for having granted backdated options.  The report went to great

11   pains to state that it was only assessing risk, not determining whether backdating actually took

12   place (Herkenhoff Decl. Exh. A at 3).

13   The CFRA report identified four flagged grants at CNET that were dated June 3, 1998,

14   April 17, 2000, October 18, 2000, and October 8, 2001 (*id.* at 7).  Each of them was granted at

15   or near a periodic low in the stock price, followed by a sharp increase.  Of these four grants,

16   however, plaintiffs here only plead facts that the grant on October 18, 2000, was backdated.

17   Plaintiffs state that their "analysis [of the options] follows in the footsteps of the

18   widely-accepted analytical model used by *The Wall Street Journal* and the CFRA to reveal the

19   nationwide backdating scandal" (Opp. at 9).  Similarly, in the complaint plaintiffs pleaded that

20   they "employ[ed] a widely accepted analytical model for detecting backdated options — the

21   price action of an issuer's common stock twenty days before and twenty days after the date of

22   grant" (Compl. ¶ 60).  It seems, however, that plaintiffs only followed those footsteps halfway.

23   For instance, after looking at the twenty days after the grant date, the *Wall Street Journal*'s

24   study ranked the returns in that period against all other possible grant dates within the year to

25   establish how unusual, versus the rest of the stock's behavior, the activity following the grant

26   date was.  The CFRA study compared the number of at-risk grants to the total number of grants.

27   Plaintiffs made no such comparisons.  They barely used an analytical model at all.  They merely

28   looked at the stock price movement.  Implying otherwise is disingenuous.

**United States District Court**
For the Northern District of California

They say that their method is "widely accepted." They fail to plead where their method came from, whether it was used by anyone else, or whether it was peer-reviewed or bore other indicia of academic approval. This is not to say that the Court would necessarily require plaintiffs to perform a complex financial analysis at the pleading stage. Nor to say that the CFRA's and the *Wall Street Journal*'s methods are the only valid methods. Sound analytical methods are one way that plaintiffs could have eliminated the possibility that the returns from the grants were the product of dumb luck. Without them, that inference is more difficult to support.

### 3.   BACKDATING AND CNET.

Plaintiffs allege that demand would have been futile because each of the directors either participated in the scheme or received backdated options themselves. A director would be interested if he or she knowingly received backdated stock options. A director is considered interested if he or she is on both sides of a transaction, that is, the director is engaging in self-dealing. *Aronson*, 473 A.2d at 812. Furthermore, "a director is interested when he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders." *Rales*, 634 A.2d at 936. If a corporate decision will have a detrimental impact on the director, but not the corporation or its stockholders, a director can be considered interested. *Ibid.* If a director received backdated stock options, he or she would be receiving a benefit not shared by the shareholders. When purchasing the company's stock, the shareholders did not have the benefit of reaching back in time to buy their shares at low-price point. A decision to correct the grants would have a detrimental impact on the directors by removing a financial benefit they received. Since backdating is a form of fraud, the directors could be subject to a substantial likelihood of personal liability. Accordingly, if plaintiffs can plead with particularity that the directors received backdated grants, those directors will be considered interested.

In *Ryan v. Gifford*, ___ A.2d ____, 2007 WL 1018208, *8–*9 (Del. Ch. Feb 6, 2007), a Delaware court held that knowing approval of backdated option grants, along with intentional failure to disclose them, would render demand futile. In pleading that demand was futile, the

United States District Court

For the Northern District of California

1    court held that plaintiffs had pleaded particularized facts that if true, could show the grants to be

2    backdated.  The *Ryan* plaintiffs relied heavily on a report prepared by Merrill Lynch that did an

3    empirical analysis comparing the annualized returns from the reported grant dates versus the

4    annualized returns for the stock itself.  The reported grant dates yielded a return higher than the

5    stock's annualized return by a factor of ten.  Additionally, the plaintiffs alleged that stock

6    options were not granted pursuant to an overall plan; options were granted sporadically.

7    Because such facts were pleaded with particularity, the Delaware court held that for purposes of

8    demand futility, the options were backdated.

9         Judge Maxine Chesney of our own district, however, held that merely alleging that

10   options were granted at a periodic low in stock price that was followed by a sharp jump in price

11   was not sufficient to plead a pattern of backdating.  More facts, including how often and at what

12   times past stock options were granted, were needed to show a pattern.  *In re Linear Tech. Corp.*

13   *Deriv. Litig.*, 2006 WL 3533024 at *3 (N.D. Cal. Dec. 7, 2006) (Chesney, J).   Much like the

14   plaintiffs in *Linear Tech.*, plaintiffs here rely on pointing out instances where options were

15   granted at a periodic low point in stock price, followed by an increase.  They do not plead any

16   facts as to when any other options were granted, or under what circumstances they were

17   granted.  Nor do they plead any particularized facts regarding the board's role in granting the

18   options.  In response, nominal defendant presents facts in the documents on which plaintiffs

19   rely to show that at least some of the grants were made pursuant to an overall plan and thus

20   could not have been backdated.

21              **A.       The Eight Alleged Grants.**

22        The eight grants occurred between 1998 and 2003.  Here, this order analyzes each grant.

23                   **(1)     *June 3, 1998.***

24        On this date, plaintiffs allege, a split-adjusted grant of 1.2 million shares of stock was

25   given to CNET's then-chairman Minor.  The stock's price rose 115.1% in the twenty trading

26   days following the grant, nearly doubling the grant's value (Compl. ¶¶ 63–64).  Defendants

27   contend that this grant was made to Minor for taking on additional duties as CEO of Snap!, a

28   joint venture with NBC.  A press release to that effect was issued on June 9, 1998, and a copy

1   was included in CNET's Form 8K filed shortly thereafter (CNET Req. Jud. Not. Exh. BB).

2   The press release announcing Minor's new duties came several days *after* the stated date of the

3   grant.  If the grant date and the press release were contemporaneous in time, that could negate

4   the near-doubling in the stock price.  This was not the case.  Given the twofold increase in stock

5   price and the lapse of time between the grant date and the press release, plaintiff has pleaded

6   facts that support the inference that this grant was backdated.

7                         **(2)     *May 25, 1999.***

8               Allegedly, an option grant of 448,006 shares was made to Marino on this date.

9   Twenty trading days later, the stock price had gone up by 7.2% (Compl. ¶ 65).  Defendants

10  contend that this grant was made in connection with Marino's starting work at CNET.  In

11  support of this, they present the offer letter to Marino, which was filed as an attachment to a

12  quarterly report filed with the SEC.  Plaintiffs' complaint references all financial statements

13  filed by CNET with the SEC between the years of 1998 and 2006.  Thus, the contents of this

14  document are appropriate for judicial notice.  It listed his start date as May 24, 1999 (CNET

15  Req. Jud. Not. Exh. Y).  The grant date was the next day after that, May 25, 1999; however, this

16  severely undercuts the contention that this date was chosen at some time after the fact.  Indeed,

17  under APB 25, since Marino's beginning employment was a condition of the grant, May 24,

18  1999, was the earliest possible measurement date.  At most, the measurement date was off by a

19  single day.

20              Defendants also point out that the stock dropped precipitously after the grant date.

21  Marino never actually exercised the option because it was never in the money.  This grant,

22  however, was tied to an event at the company and was not selected randomly.  Plaintiffs merely

23  alleged that there was a runup in stock price after the grant date.  The measurement date, at

24  most, was wrong by a single day.  Plaintiffs have not sufficiently pled facts supporting an

25  inference that the grant was backdated.

26                         **(3)     *April 17, 2000.***

27              This grant was allegedly made to Bonnie, Marino and Woodrum, with the executives

28  receiving 200,000, 200,000 and 125,000 options respectively.  On the date of the grant, the

                                                    17

stock was trading below its average for the year.  Twenty trading days later, the stock showed a 66.2% increase in price (Compl. ¶ 66).  Defendants point out that these options were never exercised because the stock price fell shortly thereafter.  Defendants also contend that if this was a scheme to enrich directors, then clearly someone picked the wrong grant date.  This argument carries little weight.  The grant date could have been changed before the stock fell.  The directors and officers may have thought that the stock price would keep rising thereafter, so they went with the lowest price they could find in a certain period.  Plaintiffs have successfully pleaded that this grant was backdated.  It was not selected as part of an overall plan, and the sharp increase in stock price afterward is sufficient to eliminate the possibility that the grant date was the product of blind luck.

### (4)    *June 30, 2000.*

On this grant date, 60,000 options were granted to Colligan, Robison and Kertzman.  Colligan and Robison are current directors.  As with the grant dated April 17, 2000, the stock was trading below its annual average.  The stock showed a 35.6% increase in price over the next twenty trading days (Compl. ¶ 67).  CNET argues that this option grant could not possibly have been backdated.  The date had been selected as part of the existing stock options plan, as detailed in the proxy statements for the years 1998 and 1999, incorporated into plaintiffs' complaint by reference.  Directors, such as Colligan, Robison and Kertzmann, would be given options grants on June 30 of each year.  This practice was first disclosed in 1998 and was continued through 2000 (CNET Req. Jud. Not. Exhs. N, O).  The grant date for these options was selected three years in advance and disclosed in publicly-filed statements.  Because the option was granted pursuant to an overall plan, and the facts alleged fit into the pattern of that plan, plaintiffs' allegations do not show backdating.

### (5)    *October 18, 2000.*

Plaintiffs allege that 1.15 million options were granted to executives Rosensweig, Briggs and Marino.  The stock was trading at considerably less than the annual average, and was at its lowest price in the month.  The stock price showed an increase of 38.7% over the exercise price within the twenty trading days following the grant (Compl. ¶ 68).  Defendants argue that this

was a welcome grant given to new employees on the completion of a merger with another internet-media company, ZDNet.  The acquisition was announced on October 17, 2000, and was described in financial statements filed with the SEC shortly  thereafter.  Furthermore, October 18 was the day on which Rosensweig, Briggs and Marino became employees of CNET (CNET Req. Jud. Not. Exh. CC).  Non-employees cannot receive options under any option plans. October 18, 2000, was the first date on which the grant's price could have been measured.

Defendants concede that the run up in the stock price after the grant was quite striking. They point out, however, that the grant came on the heels of very good news:  CNET had just acquired ZDNet, its largest rival.  Furthermore, the three recipients never exercised any of the options because by the time the options had vested, the stock price had fallen back to earth and the options were underwater.  The law, however, may punish even the unsuccessful fraudster, or at least the incident could be used to establish an overall pattern.  This particular grant was made upon the occurrence of an event in the company and was made pursuant to an overall plan.  Rosensweig, Briggs and Marino had just joined the company pursuant to the merger, so they were given options.  Mere reliance on the numbers is not sufficient when plaintiffs are confronted with a legitimate, judicially-noticeable explanation for the grant date.  To plead with particularity that this grant was backdated, plaintiffs would need to allege specific facts showing that this was not the true grant date.  Here, they have not done so.

### (6) *October 8, 2001.*

Bonnie, Briggs, Fatum, Rosensweig and Woodrum allegedly received a grant of 1.2 million options on October 8, 2001.  As with other grants, the exercise price was considerably lower than the yearly average price.  The stock rose in the twenty trading days following the grant date, yielding a cumulative return of 49.7% over that time.  The exercise price was the third lowest price for that month (Compl. ¶ 69).  Defendants argue that if this grant was part of some massive scheme to enrich the grantees, why not go for the lowest price they could find? This argument is like giving a bank robber credit for leaving some cash in the vault.  Perhaps they did not want to make it too obvious by being too greedy.  The simple fact that there were days close in time where the stock closed at an even lower price is not sufficient to defeat the

19

United States District Court

For the Northern District of California

facts pleaded by plaintiffs.  Plaintiffs have successfully pleaded that this grant may have been backdated.  This grant was not made pursuant to some overall plan, and the numbers surrounding it give rise to an inference that the date was changed.

**(7)**     ***June 24, 2003.***

On June 24, 2003, directors Colligan and Robison and four other CNET executives allegedly received a total of 930,000 options on this date.  Again, the stock was trading below the annual average, and twenty trading days later, the stock had risen by 23.3% (Compl. ¶ 70). Defendants point out that CNET manually filed Form 4 statements reporting these grants to the SEC two days later on June 26, 2003 (CNET Req. Jud. Not. Exhs. W, X, Z, L, K).  Under the Sarbanes-Oxley Act of 2002, all directors and officers transacting in their company's stock were required to file a Form 4 by the close of business on the second day following the transaction.  15 U.S.C. 78p(a)(2)(C).

As this law was enacted, backdating became more difficult to pull off.  Options grants had to be recorded with the SEC within two days of the grant date.  This severely curtailed the ability to go back in time and change the grant date.  Here, Colligan and Robison complied with the filing requirements, and plaintiffs make no allegations that the Form 4 were false; again, plaintiffs merely rely on the numbers.

It is highly unlikely that defendants could have gone back in time to change the date for this grant if it was on record with the SEC two days after the fact.  Defendants would not have had time to see what the stock did in the next few days in order to find the most advantageous grant date.  This does cast doubt on plaintiffs' allegations.  It is possible that as part of the scheme, CNET had adopted a "wait-and-see" approach toward the timing of options trying to spot periodic low points.  Still, the executives and directors simply could not have known precisely what the stock would do in the coming days.  The ability to go back and change the date to a more fortuitous time is essentially the guts of any backdating scheme.  Here, plaintiffs have failed to plead facts that this grant and the accompanying returns could not have merely been the product of chance.

**(8)** *December 10, 2003.*

Current directors Mohn and Nelson allegedly received a total of 110,000 options on this date. These options showed a twenty-day cumulative return over the exercise price of 33% (Compl. ¶ 71). This grant was made to Mohn and Nelson on their joining CNET's board. The grant date was originally set for December 10, 2003, the date that Mohn and Nelson joined the board. Two days later, on December 12, 2003, Mohn and Nelson electronically filed Form 4s with the SEC disclosing the options (CNET Req. Jud. Not. Exhs I, H). As with the grant dated June 24, 2003, the recipients were obligated to file a Form 4 with the SEC within two days of the transaction, however, as of July 2003, this had to be done electronically. 15 U.S.C. 78p(a)(4). CNET's restated financial statements explained that Mohn and Nelson actually attended their first board meeting the next day, on December 11, 2003, the day after the grant date. CNET decided that the grant date should have been the date that Mohn and Nelson attended their first board meeting, instead of the date that they "joined the board." According to CNET, this option, if at all, had been "backdated" by a single day, and only because of confusion over when Nelson and Mohn's board service actually began (Req. Jud. Not. Exh. Q at 99). Nelson did exercise some of these options, although plaintiffs did not allege this in their complaint (*id.* at Exh. I). The options were later repriced to fair market value on the true grant date, December 11, 2003 (*id.* at Exh. Q at 99). Nelson repaid the difference to the company.

Against this is the fact that the original grant date of December 10, 2003, did come at the lowest point within a certain period of time. The stock rose by nearly a dollar per share on the next day, perhaps because of the news that new directors were joining the board, or for any number of other reasons. Again, plaintiffs rely solely on the numbers in pleading that this grant was backdated. They plead no other facts in support. Defendants admitted that the grant date was wrong by one day, but that is all. Plaintiffs have not met their burden to plead with particularity that this grant was illegally backdated.

To summarize, plaintiffs have successfully pleaded that the grants on June 3, 1998, April 17, 2000, and October 8, 2001, were backdated. This means that plaintiffs have pleaded that Bonnie, Briggs, Fatum, Marino, Minor, Woodrum and Rosensweig received backdated

1   options.  Of these, only Bonnie was on the board at the time the complaint was filed; the

2   remainder are former board members or executives.

3        Defendants counter by contending that although Bonnie owned and sold large amounts

4   of CNET stock, he never exercised any of the particular options plaintiffs accuse of having been

5   backdated.  The Form 4s filings with the SEC reflect this (CNET Req. Jud. Not. Exh. W).

6   Because of this, he did not actually receive any benefit not shared with the rest of the

7   stockholders.  The fact remains, however, that such benefit was available to him, depending on

8   the movement of the stock price in the future.  He stood to lose this benefit if the options were

9   investigated.

10       Defendants also argue that plaintiffs have not pleaded facts that indicate that the

11  potential benefit to directors receiving backdated grants was material.  Plaintiffs did not explain

12  in the pleadings how they calculated the value of Bonnie's stock options.  They merely alleged

13  a figure of $7.6 million.  By receiving backdated options, Bonnie still has a chance of being

14  subject to personal liability despite plaintiffs' sloppy pleading.  Plaintiffs have pleaded facts that

15  give rise to a reasonable doubt that Bonnie was disinterested.

16                    **B.      CNET's Restated Financial Statements.**

17       To allege that options were backdated, plaintiffs finally argue that defendants admitted

18  to issuing and receiving backdated options in the amended 10K filed on January 29, 2007, and

19  by repricing options that some directors and employees had received as detailed in CNET's 8K

20  filed on December 26, 2006.  Defendants have conceded that some options given to CNET's

21  directors and executives were repriced to reflect the outcome of the special committee's

22  investigation.  It seems that plaintiffs would have the Court infer, from this alone, that each

23  instance was an admission of fraud by CNET.  Plaintiffs would also have the Court ignore that

24  the special committee concluded that there was no wrongdoing by any current or recently

25  resigned directors or officers.  In view of this statement, the inference that fraud still occurred

26  despite an investigation and the eventual public release of results is improper absent other facts

27  indicating fraud.  Had plaintiffs pled other facts in support of this theory, perhaps such an

28  inference would have been proper.  Here, it is not.  Plaintiffs have not pleaded with particularity

United States District Court

For the Northern District of California

1    that the contents of the restated financial statements are untrue.  Accordingly, plaintiffs may not

2    rely on them as an automatic admission of fraud.

3         **4.    BOARD MEMBERS' ACTIONS.**

4         The order now turns to the actions CNET's board members took with respect to granting

5    stock options.  First, plaintiffs allege that as board members, individual defendants ratified the

6    grant of backdated options or, in the alternative, that ratifying the grant of backdated options

7    could not have been the product of a valid exercise of business judgment.  Mere membership on

8    a committee or board, without specific allegations as to defendants' roles and conduct, is

9    insufficient to support a finding that directors were conflicted.  *In re Sagent Tech. Inc. Deriv.*

10   *Litig.*, 278 F. Supp. 2d 1079, 1093–94 (N.D. Cal. 2003).  As a Delaware court recently noted in

11   another backdating case, however, it is difficult to imagine that someone acting as a loyal

12   fiduciary with a responsibility to properly administer a company's shareholder-approved stock

13   options plan would deliberately misrepresent that the board was fulfilling its obligations.  *Ryan*

14   *v. Gifford*, ___ A.2d ____, 2007 WL 1018208 at *12.  Much of the holding in *Ryan*, however,

15   rested on the plaintiffs' having pleaded facts that led to the inference that the board of directors

16   had ignored the company's stock options plans and had exceeded their authority by granting

17   options that were not at fair market value.  The pleadings in *Ryan* went beyond mere allegations

18   of membership on the board.

19        **A.    "Ratification" of Allegedly Backdated Grants.**

20        Here, plaintiffs have alleged that all of the current director-defendants "ratified"

21   backdated stock grants to various people (Compl. ¶¶ 210–216).  Currie, however, joined the

22   board in December 2005.  The latest backdated grant that plaintiffs even attempt to plead with

23   particularity occurred on December 10, 2003, a full two years before Currie joined the board.

24   He could not have voted on any of the allegedly backdated grants.  Plaintiffs do not plead that

25   Currie approved of or received backdated options, they only allege that he "ratified" the grants

26   and the false statements that accompanied them.  It is very unclear as to what plaintiffs mean by

27   ratifying the grants — it could be post hoc approval, willingness to participate in a coverup, or

28

knowing that the grants were backdated, or any number of transgressions.  Plaintiffs go into no further detail in their allegations.

Furthermore, under Delaware law, "[a] member of the board of directors . . . shall, in the performance of such member's duties, be fully protected in relying in good faith upon the records of the corporation, and in good faith upon such information, opinions, reports or statements presented to the corporation by any of the corporation's officers or employees, or committees of the board of directors . . . ."  Del. Code Ann. tit. 8, § 141(e) (2007).  Under this section, Currie and other board members are allowed to rely on CNET's records in good faith.  Unless Currie had reason to know that CNET's prior statements were false, he could rely on them.  Plaintiffs have not pleaded facts that would indicate that such reliance was not in good faith.  They only plead that backdating happened at some time, therefore, all of the directors at all times in a ten-year period must have known about it.  This simply does not meet the standard for pleading facts with particularity that Currie knew or should have known of the alleged backdated options.

Furthermore, once the problems with the options came to light in the press, the board did take steps to rectify the situation.  They engaged outside auditors and attorneys, did an investigation, and as a result repriced some options and restated their financial statements.  Plaintiffs have not pleaded with particularity any facts that would raise a reasonable doubt as to Currie's independence.

Defendants present similar arguments for defendants Mohn and Nelson, both of whom joined the board in December of 2003.  They were recipients of the final allegedly backdated grants for which plaintiffs have failed to plead particularized facts that those grants were actually backdated.  Assuming, *arguendo*, that plaintiffs had pleaded that this grant was backdated, the grant was made to Mohn and Nelson on their joining the board.  They did not vote to approve the grant, nor did they have input as to when the grant would occur because they were not yet on the board.  Plaintiffs plead no facts that would indicate that they knew the options had been backdated.

24

United States District Court
For the Northern District of California

Plaintiffs next argue that Mohn and Nelson "ratified" backdated grants that occurred long before they were ever affiliated with CNET and, again, plaintiffs do not shed any light as to what "ratified" actually means.  As with Currie, the idea might mean that they were complicit in granting them, or knew about them, or they failed to investigate on learning the information, or they failed to reveal the alleged backdating.  That the Court has to guess as to Mohn and Nelson's involvement shows that plaintiffs have failed to carry their burden to plead such facts with particularity.

Finally, plaintiffs argue that Mohn, Nelson, and Currie would have a substantial likelihood of personal liability because of their roles in the alleged backdating scheme.  "[T]he mere threat of personal liability for approving a questioned transaction, standing alone, is insufficient to challenge either the independence or disinterestedness of directors . . . ."  *Aronson*, 473 A.2d at 815.   As with the other grounds that plaintiffs argue, plaintiffs have not pleaded with particularity why these facts give rise to more than a mere threat of personal liability for these three directors.  None of them voted on the allegedly backdated grants.  Even if judged under *Rales*, plaintiffs have not pleaded facts with particularity that would indicate that those three directors would be unable to exercise business judgment in responding to a shareholder demand.  Accordingly, plaintiffs have failed to plead that Nelson, Currie or Mohn were not disinterested and independent.

### B.     Service on the Compensation Committee.

Colligan and Robison were on the board when allegedly backdated options were granted, and plaintiffs so plead.  They also served on the compensation committee during their tenures at CNET.  Plaintiffs allege that Colligan was a member from 1999 until 2006 and that Robison was a member from 2002 until 2003.  Elsewhere in the complaint, however, plaintiffs allege that Robison, in his capacity as a compensation committee member, made decisions about Bonnie's compensation in 2000 (Compl. ¶ 211).  Then, regarding grants in 2001, Robison was again absent from the compensation committee, according to the pleading (Compl. ¶ 213).

Again, plaintiffs repeat the allegations that as board members, Colligan and Robison "ratified" the grants of backdated options.  Again, the ratification idea is vague.  Plaintiffs'

United States District Court

For the Northern District of California

theory seems to be that backdating occurred, thus, the board members must have known about it and "ratified" it. As with the other directors, merely alleging that they ratified the grants as board members, without more, is not sufficient to plead with particularity that Colligan and Robison were not disinterested or independent or that their decisions were not the product of valid business judgment.

Pursuant to CNET's 1994 stock options plan filed with the SEC, the board could delegate the authority to administer the plan to the compensation committee. The committee was to consist of two or more disinterested, independent directors of the board who had the authority to select grant dates for the options (Singerman Decl. Exh. A at 6). The committee could, however, delegate options-granting authority to executives of CNET. The chairman of the board, the president and vice presidents of the company could execute options on the committee's behalf as long as the options complied with the provisions of the plan. It also stated that the options' price was to be at or above the stock's fair market value on the date of the grant. The options plan for 1997 contained similar language (CNET Req. Jud. Not. Exh. N). Thus, although it appears that the compensation committee was charged with administering the plan and deciding the numbers of options to be granted and the price of those options, other officers of the company could actually be responsible for executing the options. The compensation committee could delegate at least some of its options-granting authority. The compensation committee had a duty to administer the options plan, but they may not have made every single decision in granting options. Because of this, merely alleging that directors were members of the compensation committee does not demonstrate that they were not disinterested on these facts.

Plaintiffs have alleged that Colligan and Robison served on the compensation committee. Plaintiffs have also pleaded particularized facts that the options grants dated June 6, 1998, April 17, 2000, and October 8, 2001 were backdated. Colligan served on the compensation committee for the final two grants, while Robison served on the committee for the grant dated April 17, 2000. In this capacity, they had the responsibility to oversee and administer the options plans.

United States District Court

For the Northern District of California

"It is no answer to say that demand is necessary futile because . . . [the directors] approved the underlying transaction." *Brehm v. Eisner*, 746 A.2d 244, 257 n.34 (Del. 2000). Here, plaintiffs make no allegations indicating that Colligan and Robison chose the date on which the allegedly backdated options were to be granted or that they knew the grant's true date. Indeed, Colligan and Robison could have properly delegated the authority to execute these grants to some other officer at CNET. They may not have known the date on which all actions had been completed for the grants to be made. The discussion of accounting methods in this order admits of the possibility that the board members may not know the exact date on which a grant was finalized because the committee delegated that authority. Plaintiffs' allegations that because they were on the compensation committee, they must have known, do not constitute particularized facts.

Furthermore, the proxy statements on which plaintiffs so heavily rely state that compensation committee members "made decisions" regarding officer compensation (Compl. ¶ 211, 213). The proxy statements do not say what those decisions were or if they involved the dates on which the options were granted. This is not to say that plaintiffs must plead precisely what defendants knew about backdating at CNET and exactly when they knew it. That standard would be nearly impossible to meet at this stage. But where plaintiffs merely allege that approval was given without more, the facts pleaded simply do not support the inference that these two board members were not independent or disinterested or that their decisions were not protected by the business judgment rule.

CNET argues in response that it publicly stated in its restated financials that none of the officers or outside directors engaged in any wrongdoing. This included Colligan and Robison. Plaintiffs have not alleged that this statement was false, or that the amended 10K contained false statements. Plaintiffs would have the Court ignore this statement entirely, or assume that because something bad may have happened at CNET, that every statement by the company is to be distrusted in all respects. Plaintiffs are entitled to inferences in their favor at the pleading stage, however, those inferences must be reasonable. Plaintiffs are not entitled to pick and

1  choose which of defendants' statements in public documents favor them and have all others

2  ignored.

3         Here, plaintiffs have failed to plead with particularity that a majority of the board was

4  not disinterested or independent or did not exercise business judgment in making decisions

5  under *Aronson*.  Similarly, if analyzed under *Rales*, and the board did not make a decision,

6  plaintiffs have not pleaded facts that would give rise to the inference that the board could not

7  have exercised business judgment when faced with a demand.  Accordingly, nominal defendant

8  CNET's motion to dismiss for failure to plead demand futility is **GRANTED**.  Plaintiffs' claims

9  are **DISMISSED**.  Because of this, this order does not reach the merits of the individual

10  defendants' motions to dismiss.

11                     **C.    Demand and Section 14(a).**

12         Plaintiffs argue that no demand is necessary to bring a claim under Section 14(a), and

13  that they may proceed with this claim whether or not demand is excused as futile.  The

14  Ninth Circuit has not addressed this question.  Plaintiff cites a single case in support of its

15  contention.  In *Vides v. Amelio,* 265 F. Supp. 2d 273, 275–76 (S.D.N.Y. 2003), the district court

16  held that demand was not required to bring a Section 14(a) claim.  Several district courts,

17  including courts from the same district as *Vides*, have dismissed claims under Section 14(a) for

18  failure to make a demand on the board.  *See, e.g.*, *In re IAC/Interactive Secur. Litig.*, ___ F.

19  Supp. 2d ____, 2007 WL 853021, *28 (S.D.N.Y. March 21, 2006); *St. Clair Shores Gen.*

20  *Employees Retirement Sys. v. Eibeler*, 2006 WL 2849783, at *4–6 (S.D.N.Y. Oct 4, 2006); *In re*

21  *Trump Hotels S'holder Deriv. Litig.*, 2000 WL 1371317, at *10 n.5 (S.D.N.Y. 2000).  The

22  weight of the authority supports requiring plaintiffs to make a demand or plead that demand was

23  futile in alleging a claim under Section 14(a).  Furthermore, this view comports with the logic

24  of the demand requirement itself.  If a shareholder wishes to bring a lawsuit on the corporation's

25  behalf, the shareholder should have to plead that the board could not have made a disinterested

26  and independent decision to do so itself before proceeding.  Accordingly, plaintiff must plead

27  that demand was futile to bring a claim under Section 14(a).  They failed to do so, thus, this

28  claim will be **DISMISSED** as well.

**United States District Court**
For the Northern District of California

**5.    DENIAL OF LEAVE TO AMEND.**

This is the fourth iteration of plaintiffs' complaint.  Plaintiffs were granted two extensions so that they could file their complaint after CNET had released its restated financials.  At prior hearings, plaintiffs were also warned that such delay would be allowed, but that plaintiffs should be prepared to stand or fall by this complaint.  Plaintiffs had every incentive to plead their best case in this complaint.  This action has been going on for nearly nine months, so plaintiffs had ample opportunity to investigate their allegations.  The Court is inclined to deny further leave to amend in light of the prior history of this action.  A final ruling on this matter is reserved until the Court receives counsel's arguments, as explained below.

**CONCLUSION**

For all of the above-stated reasons, nominal defendant CNET's motion to dismiss for failure to plead demand futility is **GRANTED**.

The Court wishes for parties to address the issues of whether plaintiffs should be or can be permitted to take the depositions of defendants Colligan and Robison limite to their roles in the compensation committee and to take discovery on the narrow issue of whether Colligan and Robison are tainted because of their service on the compensation committee and whether this could be followed by a possible motion for leave to file an amended complaint.  Specifically, submissions should address the Court's authority to allow such discovery in the circumstances before us and should address the relevant Delaware law as well as federal law.  Plaintiffs' memorandum will be due no later than **APRIL 18, 2007, AT NOON**, and should be no longer than ten double-spaced pages.  Nominal defendant's opposition will be due no later than **APRIL 25, 2007, AT NOON**, and should be no longer than fifteen double-spaced pages.  Plaintiff's reply will be due no later than **APRIL 30, 2007, AT NOON**, and should be no longer than five double-spaced pages.  No appendices or footnotes are permitted.  Counsel are reminded of their duty of candor and accuracy.

**IT IS SO ORDERED.**

Dated: April 11, 2007.

_____
WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE